**Michael J. HARVEY, Jr.,**
**Plaintiff-Appellant,**

v.

**PALMER COLLEGE OF CHIROPRAC-**
**TIC, Defendant-Appellee.**

**No. 84–67.**

Court of Appeals of Iowa.

Dec. 26, 1984.

Jack L. Brooks of Laird, Chickris & Brooks, East Moline, Ill., for plaintiff-appellant.

Robert D. Lambert and Greg A. Egbers of Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, for defendant-appellee.

Heard by OXBERGER, C.J., and HAYDEN and SACKETT, JJ.

HAYDEN, Judge.

Plaintiff appeals from the trial court's denial of his motion for directed verdict and grant of defendant's motion for directed verdict at the close of plaintiff's evidence in a suit in which plaintiff claims he was wrongfully expelled from defendant college.

Plaintiff began his studies as a chiropractic student at defendant college in January, 1978. He completed all academic and clinical requirements for graduation and was scheduled to graduate on December 13, 1980.

In July, 1980, plaintiff distributed on campus copies of a newspaper entitled *The Spinal Column*. This particular issue contained a cartoon which criticized the relationship between the International Chiropractic Association and the Council on Chiropractic Educations. The cartoon showed no sexual organs but implied an act of oral sex; it contained the caption "ICA shows 'loyalty advocacy and support' for CCE." The cartoon was evidently referring to an ongoing debate at the school between proponents of "straight" and "mixed" chiropractics. Plaintiff did not prepare the car-

toon or participate in printing the paper. He did, however, admit that he looked through the paper before distributing it and agreed with the cartoon's message.

On November 21, 1980, plaintiff was charged with violating student standards by distributing the July issue of the paper. A hearing was held before the Student Judiciary Committee (SJC) which imposed a sentence of suspension. The administration increased the penalty to expulsion. Plaintiff was found guilty of unprofessional conduct. Plaintiff brought suit and at the commencement of trial there were three theories remaining: breach of contract, fraud, and intentional infliction of emotional distress. The case was tried to a jury. At the close of plaintiff's evidence the trial court directed a verdict for defendant. The trial court found, inter alia, that (1) the contract was one of adhesion and that the doctrine of reasonable expectations was applicable; (2) strict contract principles were inapplicable although they could be applied by analogy; (3) the expulsion was based on adequate evidence and was not arbitrary; (4) bias of the decision-maker had not been demonstrated; (5) the administration had the prerogative to increase the penalty; (6) the standard of conduct in question was not unduly vague; and (7) other matters complained of were mere irregularities.

Plaintiff raises a number of issues on appeal. In view of our holding, we do not consider all of the issues raised.

■ Our review of this action at law is on assigned error. Iowa R.App.P. 4. In determining whether a jury question was engendered when a party seeks a directed verdict we apply the same principles as the trial court: namely, we view the evidence in the light most favorable to the nonmoving party, regardless of whether such evidence is contradicted, to determine if reasonable minds could differ on the issue. If reasonable minds could differ, the issue is for the jury. *Meeker v. City of Clinton,* 259 N.W.2d 822, 828 (Iowa 1977).

■ Although the due process clause of the fourteenth amendment is applicable only to state action, *see Swanson v. Wesley College, Inc.,* 402 A.2d 401, 403 (Del.Super. Ct.1979), "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Abbariao v. Hamline University School of Law,* 258 N.W.2d 108, 113 (Minn.1977). Courts have analyzed the relationship between a student and a private university under several legal theories, including the law of contracts and the law of associations. *See Tedeschi v. Wagner College,* 49 N.Y.2d 652, 658–60, 404 N.E.2d 1302, 1304–06, 427 N.Y.S.2d 760, 763–64 (1980). Neither theory fits perfectly and, therefore, should not be rigidly applied. *Id.; see also Slaughter v. Brigham Young University,* 514 F.2d 622, 626 (10th Cir.), *cert. denied* 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975); *Napolitano v. Trustees of Princeton University,* 186 N.J.Super. 548, 565–66, 453 A.2d 263, 271–73 (1982). It is clear, however, that a private university may not expel a student arbitrarily, unreasonably, or in bad faith. *Abbariao,* 258 N.W.2d at 112.

Courts are reluctant to intervene in cases involving dismissal for academic deficiencies since such decisions are within the expertise of the school; but dismissals for disciplinary reasons are more closely scrutinized by the courts. *Harris v. Trustees of Columbia University,* 98 A.D.2d 58, 62, 470 N.Y.S.2d 368, 370 (1983).

In *Tedeschi v. Wagner College,* 49 N.Y.2d 652, 661, 404 N.E.2d 1302, 1306, 427 N.Y.S.2d 760, 765, a student had been suspended for both academic and nonacademic reasons. However, she was not accorded a hearing before the Student-Faculty Hearing Board as required by the published college guidelines for student suspensions and dismissals. The New York Court of Appeals found it unnecessary to belabor the legal theory most applicable to the student-college relationship. The court held:

Whether by analogy to the law of associations, on the basis of a supposed con-

tract between university and student, or simply as a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual, we hold that when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed.

*Id.* at 660, 404 N.E.2d at 1306, 427 N.Y.S.2d at 764. The court reinstated the plaintiff as a student unless prior to the opening of the fall term she had been disciplined in accordance with established procedures. *Id.* at 662, 404 N.E.2d at 1307, 427 N.Y.S.2d at 766.

A similar result was reached by a federal district court applying New Jersey law in *Clayton v. Trustees of Princeton University,* 519 F.Supp. 802 (D.N.J.1981). In that case the plaintiff was accused of changing a test answer during a lab practical. He was convicted by the Princeton Honor Committee and suspended from school for one year. *Id.* at 803. After analyzing the New Jersey law of associations the court concluded:

> Certainly the proposition that once an organization has established rules for itself it must follow them is not a radical proposition. Princeton voluntarily promulgated the procedures that Mr. Clayton claims it violated in suspending him. It is not unreasonable to hold Princeton to the requirement of substantial compliance with these procedures.

*Id.* at 806. The court found there was a material dispute of fact over whether plaintiff had been accorded the procedural protections to which he was entitled under school regulations and, therefore, denied the cross-motions for summary judgment. *Id.* at 806–12.

In the present case the procedures to be followed are found in the Student Handbook and the Student Council Constitution and By-laws. According to these documents the Student Judiciary Council (SJC) should be composed of two committees of five members each who are appointed by the student council president with the ad-

vice and consent of the student council. The terms of members are staggered so that no more than three terms expire at the same time. Temporary appointments filling vacancies are made by the second vice-president. An action against a student is initiated when the SJC receives a written statement of formal charges and a description of the circumstances surrounding the charge. All students are entitled to the advantages of due process. Any member of the SJC who cannot be impartial should disqualify himself prior to the start of disciplinary proceedings. The Appeals Committee is composed of three students and the Faculty Student Welfare Committee. The students are appointed by the committee chairman from a permanent pool of five students selected by the student council president. The same provision for disqualification applies to students on the Appeals Committee who cannot be impartial.

■ There was evidence presented in this case that these procedures were not followed. The proceeding against plaintiff was instituted after several students verbally complained about the July issue of *The Spinal Column.* Student council president Mike Temple drafted a petition calling for action against those who had distributed the paper. Members of the student council circulated the petition for students to sign. The petition called for disciplinary action because those who circulated the paper used "poor judgment" which reflected poorly on the student body. Mike Temple initiated the charges against plaintiff on behalf of the students who had signed the petition and presented evidence against plaintiff at the hearing.

The evidence also showed that Temple, as student council president, appointed all of the SJC members who heard plaintiff's case between the time when the paper was distributed and the time of the hearing. There was no evidence that the appointments were approved by the student council as required by the by-laws. There was also evidence that Temple inquired of applicants their stance on plaintiff's case before appointing them to the SJC. Temple was

later found by the SJC to have acted inappropriately in his failing to process an application of a student who was sympathetic to plaintiff. Four out of the five SJC members who heard plaintiff's case had signed the petition stating that he should be disciplined for exercising poor judgment. All three of the students on the Appeals Committee had signed the petition. It is unclear from the record whether these three students were part of a permanent pool or whether they were appointed by Temple specifically to hear plaintiff's appeal.

We agree with those courts which hold that a student at a private school should be able to rely upon the school to follow the established procedures it voluntarily promulgated. We conclude there were sufficient irregularities in the way the case was initiated and the appointment and composition of the SJC and Appeals Committee to generate a jury question on whether the school substantially complied with the letter and the spirit of its written regulations when dismissing plaintiff. That issue should have been submitted to the jury. Therefore, we reverse the trial court's granting of a directed verdict and remand the case for a new trial.

REVERSED AND REMANDED.